| | | |
|---|---|---|
| TINA BRICKLES, et al., | : | Case No. 3:18-cv-00193 |
| | : | |
| Plaintiffs, | : | District Judge Thomas M. Rose |
| | : | Magistrate Judge Sharon L. Ovington |
| vs. | : | |
| | : | |
| VILLAGE OF PHILLIPSBURG, OHIO, | : | |
| et al., | : | |
| | : | |
| Defendants. | : | |

# REPORT AND RECOMMENDATIONS[1]

## I.     Introduction

Plaintiffs' First Amended Complaint describes nightmarish crimes perpetrated by Defendant Justin W. Sanderson, a former police officer in the Village of Phillipsburg, Ohio.  Plaintiffs Tina Brickles and Kelsey Walker were victims of some of Sanderson's crimes—which he committed while working on duty as a Phillipsburg Police Officer.  Defendant Mark Wysong hired Sanderson as a Phillpsburg Police Officer.  Wysong was, at that time, Phillipsburg Police Chief.

In August 2018, Sanderson was found guilty in state court of rape, sexual battery, gross sexual imposition, kidnapping, and civil-rights violations.  *See* Doc. #s 9, 12.  He is presently an inmate at the Lorain Correctional Institution serving a 43-year sentence.  *See* Doc. #s 8, 13, 15.

---

[1] Attached is a NOTICE to the parties regarding objections to this Report and Recommendations.

In the present case, Plaintiffs—including Tina Brickles' husband Roger Brickles—proceed under 42 U.S.C. § 1983. They assert that Defendants Sanderson, Wysong, the Village of Phillipsburg violated their rights under the Fourth and Fourteenth Amendments to the Constitution. They also bring claims under Ohio law.

Defendants Village of Phillipsburg and Wysong presently seek dismissal of Plaintiffs' First Amendment Complaint under Fed. R. Civ. P. 12(b)(6). They contend that the Amended Complaint fails to raise a plausible claim against them. Defendant Sanderson is not a party to Defendants Phillipsburg and Wysong's Rule 12(b)(6) Motion.

## II.  Factual Allegations

Under Rule 12(b)(6), the factual allegations found in Plaintiffs' Amended Complaint are accepted as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Doing so discloses the following.

Defendant Sanderson's work history in law enforcement was riddled with malfeasance from the start. He worked from 2008 to 2013 as a control-room operator at the Montgomery County Juvenile Detention Center. During this time, "[he] was disciplined and suspended for, among other things, accessing pornographic web sites from a government computer while on duty, allowing a male to enter the female housing unit in violation of facility policies, and leaving his post on multiple occasions for extended periods of time."[2]  (Doc. #15, ¶10).

---

[2] Plaintiffs raise some of their allegations "upon information and belief." *E.g.*, Doc. #15, ¶10. Defendants Phillipsburg and Wysong do not question this approach to pleading. "The Sixth Circuit permits pleadings 'on information and belief' in certain circumstances. When a plaintiff 'may lack personal knowledge of a fact, but have sufficient data to justify interposing an allegation on the subject or be required to rely on information furnished by

In March 2014, Sanderson enrolled in the Dayton Police Academy as a recruit. He was fired for misconduct that included, in part, asking a female recruit and another male recruit if they were "making love" during a training exercise.

Despite his termination as a Dayton Police recruit, he completed the Ohio Peace Officer Basic Training Program in early September 2014. A month later, he was hired as a police officer for the Grandview Medical Center.

In December 2014, his two-month employment as a police officer was interrupted when Grandview Medical Center suspended him, pending an investigation of his misconduct. This included violations of the hospital's sexual-harassment policy such as photographing his erect penis next to a can of hairspray and showing it to members of the hospital's female nursing staff; contacting a known prostitute and talking with her about having her perform oral sex on him for twenty dollars; expressing his interest to his supervisors in undercover-prostitute work; and, admitting to the hospital's police department that he had spoken to prostitutes before work, sat in front of drug houses, and talked with people after they purchased drugs. The hospital police department did not participate in undercover drug or prostitution operations.

In late December 2014—after just shy of three months on the job—Sanderson resigned his position as a hospital police officer. He resigned in lieu of involuntary termination for his misconduct.

---

others,' pleading on information and belief may be appropriate." *Business & Quality Integration, LLC v. Ratcliff*, 2015 WL 4610338, at *6 (S.D. Ohio 2015) (Rose, D.J.) (quoting, in part, *Starkey v. JPMorgan Chase Bank*, 573 F. App'x 444, 447 (6th Cir. 2014)). Because Defendants do not argue against accepting the truth of Plaintiffs,' on the ground that some are raised "upon information and belief," their allegations are presently accepted as true and construed in Plaintiffs' favor.

Sanderson's next law-enforcement job began in July 2015 when G4F Security Solutions USA hired him as a security officer and assigned him to work in the Dayton Metro Library. At this time, G4F also employed Defendant Wysong. Wysong hired Sanderson to work as a security officer. Before Wysong decided to hire Sanderson, he knew about Sanderson's past misconduct by way of a background check that revealed, in part, his improper actions at the Juvenile Detention Center and Grandview Medical Center. Wysong supervised Sanderson during his year-long employment at G4F.

In June 2016, Sanderson resigned his position with G4F. By this time, Wysong was chief of the Phillipsburg Police Department and the sole Phillipsburg police officer. In June 2016, Wysong hired Sanderson as a Phillipsburg police officer.

Things apparently went along quietly until May 2017 when Sanderson—while on duty as a Phillipsburg police officer—stopped Plaintiff Walker as she was driving home. Sanderson claimed that he thought Walker was driving while intoxicated. He handcuffed her and placed her in the back of his police cruiser but did not read Miranda rights to her, did not search her, and did not tell her she was under arrest. Then, rather than taking Walker to jail—Phillipsburg does not have a separate police station or a jail—Sanderson drove her to the Phillipsburg municipal building. The building was locked and no one was inside. He unlocked the building and entered with Walker.

After implying to Walker that he was asking her for sex in exchange for favorable treatment, Sanderson performed field sobriety tests on her while she remained handcuffed. He told her that she had failed the tests. During and after the tests, Walker was crying.

While Walker remained handcuffed, Sanderson groped her and removed her shorts and underwear. He then raped her while she was still handcuffed. After this, he removed the handcuffs and raped her again. "At no time did Walker consent to Sanderson's actions. [She] feared for her life if Sanderson came to believe that she would report his unlawful behavior." *Id*. at ¶34. After Sanderson twice raped her, he told her "that he would not tell if she did not." *Id*. at ¶35.

Sanderson also targeted and preyed upon Plaintiff Tina Brickles. It began in June 2017 when she drove past a police car while on her way home from a friend's house. Ten minutes after she arrived home (around 11:10 p.m.), Sanderson appeared at the door of her home. He was on duty and wearing a Phillipsburg police department uniform. He was equipped with a police radio, handcuffs, and his duty firearm. He asked her if she knew her husband had a warrant for his arrest, and he told her he had a warrant for her arrest. He did not show her any warrant or other paperwork. He instead asked her to go to the kitchen where the light was better. Once there, he asked her to turn away, and he patted her down. He then pulled on the belt loop of her shorts. Under the guise of patting her down, he felt her breasts under her bra and pulled her bra away from her body.

Sanderson handcuffed Brickles, placed her in a police cruiser, and drove to the Phillipsburg municipal building. The building was locked, dark, and unoccupied. Once inside, Sanderson took the handcuffs off Brickles. He then felt inside the pockets of her shorts. He asked her if she was wearing underwear while continuing to pull at her shorts.

Sanderson told her that she had a warrant in Eaton. She sensibly "told him to have

Eaton come pick her up, because she was not comfortable with the situation or with how Sanderson was acting." *Id*. at ¶53. Sanderson stood in front of Brickles for a long time. "He then asked her if there was some way they could clear this incident up, or if she needed to go to jail. Brickles took this statement as a request by Sanderson for some type of sexual activity in exchange for not going to jail. She told him she was not that kind of person, which she intended and Sanderson understood as a rejection of his request." *Id*. at ¶54. Sanderson told Brickles that he had been to jail and asked her if she wanted to know why. She did not respond.

Eventually, after additional threatening behavior, Sanderson handcuffed Brickles. She started to cry. He then stood behind her and put his hand on her neck, back, and cupped her breast. She tried to move away but "Sanderson put his hand down the front of her shorts and underwear and penetrated her vagina with his fingers." *Id*. at ¶61. She again told him that she was not that type of person but there was little she could do to resist because she was handcuffed and alone with him in the Phillipsburg municipal building. Sanderson then left her alone and went into an office. She sat down and started to cry and pray.

Sanderson returned and sat in a chair in front of Brickles. He stared at her for fifteen minutes. She started to tell him things because she thought he was going to hurt her or rape her. He responded, in part, by telling her that he would be working again the following weekend and would stop by her house if she did not take care of the warrant. He eventually drove her home.

A week or so later Sanderson returned to Brickles' home at 11:30 p.m. She told

him to leave and never return.

What does all this have to do with Defendants Phillipsburg and Wysong?  Nothing causative they say; it was all Sanderson's misconduct.  This polemic underpins their contention that Plaintiffs have not raised a plausible constitutional claim against them.

Plaintiffs argue otherwise.  They contend that their Amended Complaint raises plausible claims against Defendants Phillipsburg and Wysong under several theories of municipal liability under 42 U.S.C. § 1983:  (1) Inadequate screening of Sanderson before hiring him as a police officer; (2) failure to train, supervise, and discipline Sanderson; and (3) violations of the Equal Protection Clause.  (Doc. #24, *PageID* #222).

## III.  Rule 12(b)(6) and Plausibility

To survive a Rule 12(b)(6) Motion, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Hensley Mfg. v. ProPride, Inc.,* 579 F.3d 603, 609 (6th Cir. 2009) (quoting *Iqbal,* 129 S.Ct. at 1949).  This "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Iqbal*, 556 U.S. at 678 (quoting, in part, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

"The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it stops short of the

line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678;

*see Reilly v. Vadlamudi*, 680 F.3d 617, 622 (6th Cir. 2012).

## IV.    Discussion

## A.    <u>Section 1983 and Municipal Liability</u>

To state a plausible claim for relief under § 1983, a plaintiff must allege facts

sufficient to show "that a person acting under color of state law deprived him [or her] of a

right secured by the Constitution or laws of the United States." *Everson v. Leis,* 556 F.3d

484, 493 (6th Cir. 2009); *see also Upsher v. Grosse Pointe Pub. Sch. Sys.*, 285 F.3d 448,

452 (6th Cir. 2002).

"It is well established that a municipal entity may not be sued for injuries inflicted

solely by its employees or agents under § 1983.  A plaintiff may only hold a municipal

entity liable under § 1983 for the entity's own wrongdoing." *Baynes v. Cleland*, 799 F.3d

600, 620 (6th Cir. 2015) (citing *Monell v. Dep't of Social Servs.,* 436 U.S. 658, 694

(1978)) (other citation omitted); *see D'Ambrosio v. Marino*, 747 F.3d 378, 388-89 (6th

Cir. 2014).  This level of blame does not subject a municipality or other local entity to §

1983 liability simply because it "employs a tortfeasor." *Board of Cty. Comm'rs v. Brown,*

520 U.S. 397, 403 (1997).  Section 1983 mandates more:  A plaintiff must identify a

municipal " 'policy' or 'custom' " that caused the plaintiff's constitutional harm. *Id*. at

403 (citing *Monell,* 436 U.S. at 694) (other citations omitted).

> Locating a "policy" ensures that a municipality is held liable only for those
> deprivations resulting from the decisions of its duly constituted legislative
> body or of those officials whose acts may fairly be said to be those of the
> municipality.  Similarly, an act performed pursuant to a "custom" that has
> not been formally approved by an appropriate decisionmaker may fairly

subject a municipality to liability on the theory that the relevant practice is
so widespread as to have the force of law.

*Id*. at 403-04 (citing *Monell,* 436 U.S. at 694, 690-91) (other citation omitted).

Causation is thus the heart of § 1983 municipal liability:

[I]t is not enough for a § 1983 plaintiff merely to identify conduct properly
attributable to the municipality. The plaintiff must also demonstrate that,
through its *deliberate* conduct, the municipality was the 'moving force'
behind the injury alleged. That is, a plaintiff must show that the municipal
action was taken with the requisite degree of culpability and must
demonstrate a direct causal link between the municipal action and the
deprivation of federal rights.

*Id*. at 404 (emphasis in original); *see Jackson v. City of Cleveland*, 925 F.3d 793, 828 (6th

Cir. 2019); *see also Brown v. Chapman*, 814 F.3d 447, 462 (6th Cir. 2016).

Before delving into the plausibility of Plaintiffs' claims against Defendants

Wysong and Phillipsburg, in light of Plaintiffs' factual allegations, it is assumed herein

(but not conclusively determined) that Sanderson violated Tina Brickles' and Kelsey

Walker's federal constitutional rights.

**B.    Inadequate Screening—Claims Six and Twenty-One**

Plaintiffs allege in their Amended Complaint that Defendant Wysong was the final

decisionmaker or policymaker with respect to hiring decisions at the Phillipsburg Police

Department, and specifically, the decision to hire Sanderson as a Phillipsburg police

officer.  Plaintiffs claim that despite Defendant Wysong's actual knowledge of

Sanderson's past misconduct, or his "grossly inadequate screening of Sanderson's

background…" (doc. #15, ¶119), Wysong was "deliberately indifferent to the risk that a

violation of the constitutional rights of the Plaintiff[s] or of other female detainees or

arrestees would follow the decision to hire Sanderson." (Doc. #15, ¶s 120, 222).

Defendants Phillipsburg and Wysong maintain that Plaintiffs have failed to raise plausible claims of municipal liability against them for inadequate screening. They reason that Plaintiffs' Amended Complaint lacks factual content from which the court may draw a reasonable inference that Sanderson's unlawful searches and seizures, and sexual assaults were "highly likely" and a "plainly obvious consequence of Wysong's hiring decision." (Doc. #19, *PageID* #159).

"[W]ith respect to a single decision, municipal liability is appropriate 'where the decisionmaker possesses final authority to establish policy with respect to the action ordered.' " *Bible Believers v. Wayne County, Mich.*, 805 F.3d 228, 260 (6th Cir. 2015) (quoting, in part, *Monell*, 436 U.S. at 478). "Cases involving constitutional injuries allegedly traceable to an ill-considered hiring decision pose the greatest risk that a municipality will be held liable for an injury that it did not cause." *Brown,* 520 U.S. at 415. "To prevent municipal liability for a hiring decision from collapsing into *respondeat superior* liability, a court must carefully test the link between the policymaker's inadequate decision and the particular injury alleged." *Id*. at 410. This careful testing employs the "deliberate indifference" standard, *id*., as Plaintiffs impliedly or expressly acknowledge by asserting that Wysong was deliberately indifferent to the risk Sanderson posed to them and other female arrestees and detainees.

"[D]eliberate indifference" is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action…. [T]he risk from a single instance of inadequate screening of an applicant's background is not

'obvious' in the abstract sense; rather, it depends on the background of the applicant…."

*Id*. And the applicant's background must speak loudly and specifically:

> Only where adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right can the official's failure to adequately scrutinize the applicant's background constitute "deliberate indifference."

*Id*. at 411.

Defendants Wysong and Phillipsburg contend that there are no allegations in Plaintiffs' Amended Complaint suggesting some deficiency in Sanderson's history or background would make it highly likely that he would inflict the particular injury suffered by Plaintiffs. (Doc. #19, *PageID* #159) (quoting *Pineda v. Hamilton County*, No. 1:15cv693, 2016 WL 950362, *5 (S.D. Ohio Mar. 14, 2014) (quoting, *Brown*, 520 U.S. at 412)) (other citation omitted). This contention lacks merit.

Carefully testing the link between Wysong's decision to hire Sanderson and the constitutional violations Sanderson committed while on duty as Phillipsburg Police Officer leads to a reasonable conclusion that Wysong, and hence Phillipsburg, were deliberately indifferent to known or plainly obvious consequences (violations of third-parties' constitutional rights) that hiring Sanderson would cause. *See Brown,* 520 U.S. at 411. This careful testing takes into account—as *Brown* instructs—that no single instance of inadequate screening by itself constitutes deliberate indifference to the obvious risk of trespass on the constitutional rights of third parties "in the abstract sense." *Id*. at 410. This testing also assumes—similar to *Brown*—that Police Chief Wysong's decision itself was legal, and Plaintiffs do not allege that he instructed Sanderson to use excessive force

or otherwise violate the constitutional rights of the women he arrested. *See id*. at 405. Plaintiffs' allegations must plausibly show more than "simple or even heightened negligence…." *Id*. at 407. Rather, the inquiry accepts Plaintiffs' facts as true, construes them in their favor, and asks whether "*this* officer was highly likely to inflict the *particular* injury suffered by the plaintiff[s]. The question of the background of the particular [job] applicant and the specific constitutional violation alleged must be strong." *Id*. at 412 (emphasis in *Brown*).

With all this in mind, to test the link between Police Chief Wysong's hiring decision and Plaintiffs' injuries, the issue is whether a full review of Sanderson's background reveals that Wysong "should have concluded that [Sanderson's] use of excessive force would be a plainly obvious consequence of the hiring decision." *Id*. at 412-13 (footnote omitted).

If Wysong had fully reviewed Sanderson's law-enforcement employment and disciplinary history, he would have discovered the lengthy list of Sanderson's misconduct during his very brief and undistinguished law enforcement career. Plaintiffs allege that Wysong, the only full-time, paid police officer in—and Police Chief of—the Phillipsburg Police Department and the final decisionmaker with respect to hiring decisions at the Phillipsburg Police Department, *see* doc. #15, ¶s 24-25, decided to hire Sanderson despite actually knowing the following:

> a. Sanderson had been disciplined and suspended on multiple occasions while employed at the Montgomery County Juvenile Detention Center for, among other things, viewing pornographic web sites on one of his employer's computers while on duty, allowing a male to enter a unit housing juvenile

female residents, and leaving his post on multiple occasions and leaving the detention center for extended periods of time;

b. Within two months of beginning his employment at Grandview Medical Center Police Department, Sanderson had taken a photograph of his erect penis next to a can of hairspray and exhibited that photograph to nursing staff around the hospital;

c. Grandview Medical Center had suspended Sanderson for an investigation of his violations of the hospital's conduct and discipline policy and its sexual harassment policy;

d. Sanderson had had several unauthorized contacts with a known prostitute while employed as a Grandview Medical Center police officer, during which the exchange of money for sex acts was discussed, and at least one contact during which Sanderson displayed his duty weapon and Grandview Police badge to the prostitute;

e. Sanderson had resigned his position at Grandview Medical Center Police Department less than three months after starting there and while the investigation into his sexual misconduct was still pending;

f. Sanderson's only prior employment as a peace officer was his two-month stint at Grandview Medical Center;

g. Sanderson had had little or no prior on-the-job training as a peace officer;

h. Due to the size and budget of the Phillipsburg Police Department, Sanderson would frequently be the only peace officer on duty during his shift and that he would therefore be working, during those times, without any supervision;

i. Sanderson's shift would frequently be during the time of day after the Phillipsburg municipal building [was] closed, locked, and unstaffed for the day;

j. The Village of Phillipsburg and Wysong would be providing Sanderson a key to the Phillipsburg municipal building, which would give him unsupervised and unfettered access to the Phillipsburg municipal building;

k. The Village of Phillipsburg had no police cruisers equipped with cameras, no body cameras, and that there were no cameras placed in the Phillipsburg

municipal building, such that any misconduct by a police officer was likely to go undetected; and,

l. Sanderson lacked the knowledge, experience, and judgment to perform the duties of a peace officer, especially without direct supervision.

(Doc. #15, ¶26). It is reasonable to infer that Wysong knew these facts given that he was Sanderson's supervisor of Sanderson at G4S, a private security firm. Even if Wysong did not actually know these facts, a thorough review of Sanderson's background before he hired as a Phillipsburg Police would have exposed these facts to the light of day.

These facts give rise to a more than a probability that Sanderson would violate the federal constitutional rights of the women he arrested. A full review of Sanderson's background in law enforcement reveals that Wysong should have concluded that Sanderson's use of excessive force would be a plainly obvious consequence of the hiring decision. Sanderson's work history reflects not only immaturity and irresponsibility, as indicated by, among other things, his comment to his fellow police recruits if they were "making love" during a training exercise and his desertion of his duty post at the Juvenile Detention Center on multiple occasions for extended periods of time. His work history also involved bizarre miscreant conduct. Sanderson disclosed his inability to control his predilection for gratifying, or attempting to gratify, his sexual desires during his hours of employment and while charged with a public responsibility: (1) He accessed pornographic web sites from a government computer while employed at the Juvenile Detention Center, (2) he photographed his erect penis next to a can of hairspray and exhibited that photograph to female nursing staff members at Grandview Medical Center while on duty as a hospital police officer within the first two months of his employment

there, and (3) he made contact with a known prostitute while on duty as a hospital police officer and talked about having the prostitute perform oral sex on him for twenty dollars, despite lacking any authority or training to conduct a prostitution-related investigation. *Id*. at ¶¶ 10, 14-18.

Perhaps most troubling, Sanderson's work record illustrates his willingness to exceed the bounds of his lawful authority and to use his authority for his personal pursuits. While employed at the Juvenile Detention Center, Sanderson left his duty post on multiple occasions for extended periods of time, including leaving the facility entirely. *Id*., ¶ 10. As a hospital police officer, he told his supervisors about his interest in undercover work. He admitted to them that, on several occasions, he had spoken to prostitutes before work, sat in front of drug houses, and spoken to people after they purchased drugs, despite the fact that the hospital police department did not participate in undercover drug or prostitution operations. Sanderson's actions were not done as part of any such operation. *Id*. at ¶¶ 13-17. Further, on one occasion when a prostitute got into Sanderson's vehicle, he showed her a black handgun and his hospital police badge. *Id*. at ¶ 16. Remarkably, Sanderson's misconduct at the hospital happened within the first two months of his employment there, and this was his first and only job as a certified peace officer before Wysong hired him as a Phillipsburg police officer. *Id*. at ¶¶ 13, 14, 18.

The combination of Sanderson's immaturity and irresponsibility, his inability to control his predilection for gratifying, or attempting to gratify, his sexual desires while on the job, and his willingness on multiple occasions to exceed the bounds of his authority and to use his authority for his personal missions, reasonably demonstrates the existence

of the obvious risk that hiring Sanderson would cause constitutional harm to women he would encounter and arrest while on duty.  Wysong also knew that Sanderson's work history combined with the conditions in which he would work as a Phillipsburg Police Officer exacerbated the plainly obvious risk that he would violate the constitutional rights of third parties like Plaintiffs.  Wysong ignored the fact that the only previous time when Sanderson worked alone without direct supervision as a certified police officer (at Grandview Medical Center), he sought out a vulnerable woman (a prostitute, he thought) and interacted with her while they were alone in his vehicle.  He flaunted his authority to her by showing her a handgun and badge, and he engaged in other misconduct directed at her because she was a vulnerable woman who was alone with him.  Despite such miscreant conduct, Wysong hired Sanderson as a police officer while knowing he would be required to work alone and without supervision.  He also knew that Sanderson would be working alone, without supervision, and with the accouterments of police authority: a police uniform, a police badge, a police cruiser, handcuffs, and weapons.  Sanderson would be also given a key to the Phillipsburg municipal building.  Wysong knew that Sanderson would be on duty frequently when the Phillipsburg municipal building was closed, locked, and unstaffed.  This would give him unsupervised and unfettered access to the municipal building when no one else was in the building and when no one else would interrupt his activities while in the building.  Wysong also knew that the Village of Phillipsburg had no police cruisers equipped with cameras, officers did not have body cameras, and there were no cameras in the Phillipsburg municipal building, such that any misconduct by a police officer would likely go undetected.  Given these circumstances, it

is plausible that Wysong should have concluded that a plainly obvious consequence of his decision to hire Sanderson would be that he would improperly use his position as a Phillipsburg Police Officer to seek vulnerable women, flaunt his police authority to them for the purpose of acting on his predilection to satisfy his sexual desires and, in doing so, violate their constitutional rights.

Accordingly, Plaintiff's Claims 6 and 21 are not subject to dismissal under Rule 12(b)(6).

## C.      Failure to Train, Supervise, or Discipline—Claims 7 and 22

Plaintiffs claim that the Village of Phillipsburg is liable for failing to supervise, train, and discipline its police officers and for overlooking and covering up officer misconduct.

Defendants contend that Plaintiffs have failed to set forth facts showing (1) Phillipsburg's training was inadequate; (2) Phillipsburg was deliberately indifferent to a known or obvious consequence of inadequate training; or (3) Phillipsburg ignored an obvious need for more or different training regarding unlawful searches and seizures, the use of excessive force, or sexual assault.

> The inadequacy of police training only serves as a basis for § 1983 liability "where the failure to train amounts to *deliberate indifference* to the rights of persons with whom the police come into contact." "To establish deliberate indifference, the plaintiff 'must show prior instances of unconstitutional conduct demonstrating that the County has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury.' "

*Slusher v. Carson*, 540 F.3d 449, 457 (6th Cir. 2008) (emphasis in *Slusher*) (quoting, in part, *City of Canton v. Harris,* 489 U.S. 378, 388 (1989)); *see also Shoup v. Doyle*, 974 F.

Supp.2d 1058, 1085 (S.D. Ohio 2013) (Rice, D.J.).

Plaintiffs' failure-to-train claim faces an insurmountable hurdle: Even assuming Sanderson's police training can be reasonably characterized as deficient in some respect, his particular misconduct—the sexual assaults described in Plaintiffs' Amended Complaint—did not result from deficient police training.

" 'The proper course of conduct—refraining from sexual assault and rape—is patent and obvious; structured training programs are not required to instill it. Consequently, the absence of such programs (even if such absence was proven) is not so likely to cause improper conduct so as to justify a finding of liability.' " *Branum v. Loudon County, Tenn*., 2014 WL 640634, at *7 (E.D. Tenn. 2014) (quoting, in part, *Williams v. Bd. Of County Comm'rs of Unified Govt. of Wyandotte Cty.,* 2000 WL 1375267 (D. Kan. Aug. 30, 2000) (cited with approval in *Oliver v. City of Berkley,* 261 F.Supp.2d 870 (E.D. Mich. 2003)) (citing, in remaining part, *Lewis v. Pugh,* 2007 WL 1394145 (E.D. Tex. May 11, 2007) ("Indeed it hardly seems necessary that an officer would require specific training to know that rape, sexual assault, and other blatantly criminal actions are inappropriate"); *Breland v. City of Centerville, Ga.,* 2008 WL 2233595 (M.D. Ga. May 28, 2008) ("No training is required to teach police officers not to commit sexual assaults. Sexual assault is illegal, and police officers can reasonably be expected to know, without training, that they are not allowed to take sexual advantage of their prisoners").[3] Plaintiffs, moreover, do not allege facts sufficient to raise a reasonable

---

[3] *See also Andrews v. Fowler*, 98 F.3d 1069, 1077 (8th Cir. 1996)

inference that Phillipsburg—through Wysong or otherwise—had a policy, practice, or custom that instructed or knowingly permitted Sanderson to violate the constitutional rights of women by sexually assaulting them while on duty. *Cf. Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997) ("Obviously, the Town has no policy commanding its officers to barter arrests for sexual favors. Likewise, the Town has no custom of allowing such behavior on the part of its officers.").

As to supervisory liability, Plaintiffs contend that as a matter of municipal policy or practice, Phillipsburg "chose to hire Sanderson, an inadequately trained, inexperienced officer, with a record replete with misconduct, and gave him a cruiser, a badge, a gun, a key to the municipal building, and free rein to operate however he wished, without supervision or fear of detection. Rather than place him under supervision of a responsible, trained officer, the Village provided no supervision at all…." (Doc. #24, *PageID* #229).

" [A] supervisor cannot be held liable simply because he or she was charged with overseeing a subordinate who violated the constitutional rights of another. Consequently, a mere failure to act will not suffice to establish supervisory liability." *Peatross v. City of Memphis*, 818 F.3d 233, 241 (6th Cir. 2016) (citing *Gregory v. City of Louisville,* 444 F.3d 725, 751 (6th Cir. 2006)). "[S]upervisory liability requires some 'active unconstitutional behavior' on the part of the supervisor." *Id.* (citations omitted). "'[A]ctive' behavior does not mean 'active' in the sense that the supervisor must have physically put his hands on the injured party or even physically been present at the time of the constitutional violation." *Id.*

> [A] supervisory official's failure to supervise, control or train the offending individual is not actionable *unless* the supervisor either encouraged the specific incident of misconduct or in some other way directly participated in it." "[A]t a minimum," the plaintiff must show that the defendant "at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers."

*Id.* (quoting, in part, *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) (emphasis in *Pearson*) (other citation omitted).

Plaintiffs do not allege facts sufficient to create a reasonable inference that Wysong implicitly authorized, approved or knowingly acquiesced in Sanderson's sexual assaults or unconstitutional conduct against Plaintiffs. Plaintiffs omit any suggestion from their Amended Complaint that Wysong witnessed and failed to intervene in Sanderson's sexual assaults upon them or that Wysong knew that Sanderson had attacked Walker and Brickles until he was contacted by the FBI or outside law enforcement. At best for Plaintiffs, Wysong's position as Police Chief and his knowledge of Sanderson's previous misconduct while working in law enforcement should have alerted him to be on the lookout for any misconduct by Sanderson, the only subordinate police officer in Phillipsburg at that time. But this means that Wysong was negligent or reckless; it does not mean that he "engaged in some 'active unconstitutional behavior'...." *Pearson*, 818 F.3d at 241 (citation omitted), or that he implicitly authorized, approved, or knowingly acquiesced in Sanderson's sexual assaults or unconstitutional conduct.

Lastly, Defendants contend in the Reply that although Plaintiffs advance a failure-to-discipline claim in their Amended Complaint, they failed to respond to Defendants'

contention that Rule 12(b)(6) dismissal of this claim is warranted. Defendants surmise from Plaintiffs' silence that they have abandoned their failure-to-discipline claims.

Perhaps. But more significantly, the Amended Complaint fails to raise facts sufficient to raise a reasonable inference that Wysong actually knew about Sanderson's sexual assaults on Walker or Brickles—or any on-duty misconduct Sanderson engaged in—until the FBI or outside law enforcement contacted him. As a practical matter, Wysong had no opportunity to discipline Sanderson until he learned about his nightmarish misconduct. The Amended Complaint thus fails to present a plausible claim that Wysong's failure to discipline Sanderson allowed or caused Sanderson's constitutional violations. *Cf. Doe v. Claiborne County, Tenn.*, 103 F.3d 495, 508 (6th Cir. 1996) (" 'Deliberate indifference' in this context does not mean a collection of sloppy, or even reckless, oversights; it means evidence showing an obvious, deliberate indifference to sexual abuse.")

Accordingly, Plaintiffs' Sixth and Twenty-Second Claims are subject to Rule 12(b)(6) dismissal.

**D.      Equal Protection Violations—Claims Eight and Twenty-Three**

Plaintiffs assert that Phillipsburg violated their rights under the Equal Protection Clause of the Fourteenth Amendment to the Constitution by not treating Walker or Brickles, as female detainees, similar to male detainees. They further assert that Phillipsburg discriminated against them on the basis of her gender by failing to provide a reasonably safe and secure location where female detainees could be processed. They

also maintain that their constitutional right to be free from excessive force and their right to bodily integrity were violated in a way that male detainees' rights were not violated.

Defendants contend that Plaintiffs' equal-protection claims must be dismissed because "Plaintiffs have not (nor could they) allege intentional discrimination by the Village because of their gender." (Doc. #19, *PageID* #166).

"The Equal Protection Clause forbids the State from denying to 'any person within its jurisdiction the equal protection of the laws.' " *Green v. City of Southfield, Mich.*, 925 F.3d 281, 284 (6th Cir. 2019) (quoting, in part, U.S. Const. amend. XIV, §1). " 'To state a claim under the Equal Protection Clause, a § 1983 plaintiff must allege that a state actor intentionally discriminated against the plaintiff because of membership in a protected class.' " *Purisch v. Tennessee Technological University*, 76 F.3d 1414, 1424, (6th Cir. 1996) (quoting, in part, *Henry v. Metropolitan Sewer Dist.,* 922 F.2d 332, 341 (6th Cir. 1990).

Defendants, in their Reply, do not address Plaintiffs' contention that the circumstances they describe in the Amended Complaint support plausible equal-protection claims. This suggests that Defendants have abandoned their argument that Plaintiffs have not alleged intentional discrimination in support of their equal-protection claims. This seems fair: After all, Defendants say Plaintiffs abandoned their failure-to-discipline claim by not responding to Defendants' argument for its dismissal. In other words, the venerable "fairness" adage—what's good for the goose is good for the gander—pops up.

Yet, even if Defendants have not abandoned their argument that Plaintiffs fail to allege intentional discrimination, Defendants' Reply does not address Plaintiffs' substantive contention that Phillipsburg discriminated against them on the basis of their gender by failing to provide female detainees a reasonably safe and secure location where they could be processed. Without Defendants' analytical input on this issue, it is premature to recommend dismissing Plaintiffs' equal-protection claims.

Accordingly, Plaintiffs' Claims eight and twenty-three are not subject to dismissal under Rule 12(b)(6).

**E.** **Remaining Contentions**

Defendants argue that qualified immunity protects Defendant Wysong from supervisory liability because Plaintiffs do not allege that he authorized, approved, or knowingly acquiesced in Sanderson's unconstitutional conduct.

Plaintiffs contend that qualified immunity does not apply to their claims against Wysong for failure to train, supervise, or discipline Sanderson due to Wysong's knowledge that Sanderson lacked experience as a police officer, that Sanderson had previously engaged in sexual (and other) misconduct while on duty. In these circumstances, Plaintiffs maintain, Wysong implicitly authorized, approved, or knowingly acquiesced in Sanderson's unconstitutional behavior.

At the pleading stage, plaintiffs can surmount defendants' assertion of qualified immunity "by alleging facts making out a plausible claim that defendants' conduct violated a constitutional right that was clearly established at the time of the violation." *Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016) (citing *Pearson v. Callahan*, 555 U.S.

223, 232 (2009)).  In the present case, for the reasons discussed above, *supra*, § III(C), Plaintiffs have not raised plausible constitutional claims against Defendant Wysong for failure to train, supervise, or discipline Sanderson. Qualified immunity thus shields Wysong from these claims.

Although Defendants broadly seek dismissal of all Plaintiffs' § 1983 claims against Wysong based on qualified immunity, Defendants limit their qualified-immunity arguments to Plaintiffs' claims against Wysong based on supervisory liability.  (Doc. #19, *PageID* #167).  It is therefore premature to address whether qualified immunity applies to Plaintiffs' remaining constitutional claims against Wysong.

Lastly, Defendants seek dismissal of Plaintiffs' state-law claims raised in Claims fourteen, fifteen, and twenty-five.  They argue that Plaintiffs fail to raise plausible state-law claims under Ohio Rev. Code § 4112.02(G) and that Ohio Rev. Code § 2744.02(A)(1) provides them with statutory immunity from Plaintiffs' state-law claims. It is not apparent at this early stage of the case whether the Court will exercise supplemental jurisdiction over Plaintiffs' state-law claims.  Concerns of efficient case and docket management thus advise holding Plaintiffs' state-law claims, and Defendants' arguments against them, in abeyance pending further adjudication of Plaintiffs' federal claims.  *See York v. Lucas County, Ohio*, No. 3:13cv1335, 2015 WL 2384096, at *6 (N.D. Ohio 2015) (Helmick, D.J.).

### IT IS THEREFORE RECOMMENDED THAT:

1.  Defendants Village of Phillipsburg and Mark Wysong's Motion to Dismiss (Doc. #19) be granted, in part; Plaintiffs' Claims Seven, Eight, Twenty-Two, and Twenty-Three against Phillipsburg and Wysong in his official

capacity be dismissed with prejudice; and Plaintiffs' Claims Seven and Twenty-Two against Defendant Wysong in his personal capacity be dismissed with prejudice; and

2. Defendants Village of Phillipsburg and Wysong's Motion to Dismiss (Doc. #19) be denied in remaining part.


August 5, 2019                          *s/Sharon L. Ovington*
                                        Sharon L. Ovington
                                        United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations.  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).