UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| TINA BRICKLES, *et al.*, | : | |
| | : | |
| Plaintiffs, | : | Case No. 3:18-cv-193 |
| | : | |
| v. | : | Judge Thomas M. Rose |
| | : | |
| VILLAGE OF PHILLIPSBURG, OHIO, *et al.*, | : | |
| | : | |
| | : | |
| Defendants. | : | |

───────────────────────────────────────────────────────────

ENTRY AND ORDER GRANTING DEFENDANTS VILLAGE OF
PHILLIPSBURG, OHIO AND MARK WYSONG'S MOTION FOR SUMMARY
JUDGMENT (DOC. 60)

───────────────────────────────────────────────────────────

        Pending before the Court is a Motion for Summary Judgment (Doc. 60) (the "Motion"), filed by Defendants Village of Phillipsburg, Ohio (the "Village") and Mark Wysong ("Wysong"). Defendant Justin W. Sanderson ("Sanderson") is not a party to the Motion, and claims arising under both federal and state law remain pending against Sanderson in this action. (*See* Docs. 15, 36.) In the Motion, the Village and Wysong move for an order granting summary judgment and dismissing with prejudice the remaining claims against them: the Sixth, Fourteenth, Fifteenth, Twenty-First, and Twenty-Fifth Claims for Relief.[1] (*Id.*; *see also* Doc. 36 (dismissing claims 7, 8, 22, and 23 against the Village and Wysong).) Plaintiffs Tina Brickles, Roger Brickles, and Kelsey Walker (collectively, "Plaintiffs") filed a Memorandum in Opposition to the Motion (Doc. 64) (the "Opposition"). The Village and Wysong filed a Reply in support of the Motion. (Doc. 65.) The Motion is fully briefed and ripe for review. For the reasons discussed below, the Court **GRANTS** the Motion.

───────────────────────────────

[1] Wysong is sued in both his individual and official capacities.

I.     **BACKGROUND** [2]

A.  **Sanderson's (Alleged) Actions Concerning Plaintiffs**

This case stems from the horrific actions that Sanderson allegedly took against Tina Brickles and Kelsey Walker while he was on duty as a police officer for the Village. At the time of the incidents in May and June of 2017, the Village had approximately four or five police officers, all of whom worked part-time (which typically meant one day a week) and all of whom also had full-time employment outside of their work as police officers for the Village. The Village has a population of approximately 575 residents, and its police department is housed in a single room within the Village's municipal building. Sanderson was working by himself at the time of the incidents.

At least for purposes of this Motion, it is undisputed that Sanderson raped Kelsey Walker in the Village municipal building after he pulled her over for speeding and that Sanderson sexually assaulted Tina Brickles both in her own home and in the Village municipal building after Sanderson detained her for a warrant. Sanderson is now serving a 43-year prison sentence after being found guilty in state court of several criminal charges (including rape, sexual battery, and kidnapping), some of which relate to allegations in the Complaint in this matter. (*See* Docs. 6, 8, 9, 12, 13.) Sanderson's (alleged) acts describe a nightmarish situation for Ms. Brickles and Ms. Walker, and such acts are reprehensible and abhorrent. However, the Motion presently before the Court concerns only the potential liability of the Village and/or Wysong for inadequate screening under 42 U.S.C. § 1983 ("Section 1983"), for discriminatory practices in public accommodation under Ohio Revised Code ("O.R.C.") § 4112.02(G), and for loss of consortium.

---

[2] For purposes of resolving the Motion, the recitation in the "Background" section includes undisputed facts and otherwise assumes the evidence of the non-moving party as true and draws all reasonable inferences in the nonmoving party's favor, as is appropriate at this stage. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); *Tolan v. Cotton*, 572 U.S. 650, 660, 134 S. Ct. 1861, 188 L. Ed. 2d 895 (2014).

### B. **Sanderson's Employment History**

From approximately 2007 to 2013, Sanderson was employed at the Montgomery County Juvenile Detention Center. He became a control room operator there, but was disciplined on multiple occasions for various misconduct, including accessing pornographic websites while on duty (for which he was suspended), allowing a male to enter the female housing unit in violation of facility policies, and leaving his post on multiple occasions for extended periods of time.

In or around March of 2014, Sanderson enrolled at the Dayton Police Academy. At the academy, Sanderson was involved in misconduct, including asking a female recruit and another male recruit if they were "making love" during a training exercise. Sanderson failed to meet the academy's attendance requirements and was not allowed to become an officer for the Dayton Police Department. However, he was eligible to serve as a police officer, having completed the necessary requirements.

In or around October of 2014, the Grandview Medical Center Police Department hired Sanderson as a police officer. The department had conducted a pre-employment investigation of Sanderson. While an officer with the Grandview Medical Center Police Department, Sanderson was accused of, and investigated for, misconduct, including taking a photograph of his erect penis and exhibiting the photograph to female nursing staff members and making contact with a known prostitute. According to a letter he received from the security director, Sanderson's employment was suspended under the hospital's conduct and discipline policy for violating the health network's conduct and discipline policy and harassment free workplace policy. While still under investigation, and within three months of being hired, Sanderson resigned his position.

In or around June of 2015, Sanderson was hired as a security officer at G4S Secure Solutions USA ("G4S"). He applied for a job there and was interviewed by Wysong, a senior area supervisor with G4S at the time. Wysong did not contact any of Sanderson's listed prior

3

employers, nor did anyone from G4S's Dayton office.  However, G4S did create a "Background Screening Report," which showed that G4S had contacted Sanderson's prior employers and personal references and that Sanderson had cleared a separate criminal background check with G4S (as well as a drug test).  In terms of bad conduct, the G4S "Background Screening Report" merely indicated some traffic violations.  The background check performed by G4S was not for a law enforcement position.  Sanderson worked for G4S as a certified protection officer at the Dayton Metro Library, a position that did not involve carrying a firearm, handcuffs, or a taser.

### C.  The Village Hires Sanderson

In or around October of 2015, Sanderson submitted an application for a position with the Village.  He did so based on a conversation in which Wysong had mentioned to Sanderson that he could apply for a police officer position with the Village in order to maintain his officer certification.  In addition to working full-time for G4S (which he did during all times relevant to this lawsuit), Wysong is the Village's police chief and has held that position since 1996.  Sanderson had told Wysong about having gone through the Dayton Police Academy but being unable to be hired by the Dayton Police Department because he failed to meet attendance requirements. Wysong was also aware Sanderson had recently been promoted by G4S and that Sanderson was married and had children.

When asked "who is it that is in charge of, basically, screening, interviewing, hiring an officer for the village," Wysong testified that he is.  (Doc. 60-1 at PAGEID # 597.)  The Village's normal hiring process consisted of several steps.  Once Wysong received an application for employment, he would review it and determine whether to schedule an interview with the applicant.  If an interview was scheduled, then he would meet with the applicant at the Village municipal building.  During the interview, Wysong would find out the applicant's interests and why the applicant applied for the position.  After the interview, if he decided that he wanted to

4

offer the applicant an "opportunity," then Wysong would initiate a "background process" that included sending out employment and personal reference forms as well as conducting a criminal background check and driver's license screening of the applicant. (*Id.* at PAGEID # 598-99.) If appropriate, after completion of the background process, Wysong would introduce the applicant at the next Village council meeting and make a recommendation to the mayor to bring the applicant onto the department for the standard one-year probationary period. This was the custom and practice that Wysong followed as Chief of the Village's police department.

However, Wysong admitted that he did not completely follow that process when it came to Sanderson. Specifically, Wysong did not send out the standard employment verification forms or personal reference forms that would go to prior employers, but he otherwise followed the process. He did not speak to anyone that Sanderson had worked for before, nor did he speak to any personal references of Sanderson or anyone that Sanderson knew. He also did not do anything, himself, to investigate Sanderson's conduct at past employers. And, Wysong, alone, had conducted Sanderson's interview for the position.

Prior to Sanderson's hiring by the Village, Wysong had reviewed Sanderson's personal file with G4S, which included the G4S "Background Screening Report" (referenced above) that had been generated approximately five months earlier. Also, the personal references listed in Sanderson's application for employment with the Village were the same as the personal references previously contacted by G4S per the "Background Screening Report." Additionally, Wysong had submitted a criminal background check and driver's license screening for Sanderson, which showed only traffic infractions.

On his application, Sanderson (1) claimed to have left the Grandview Medical Center Police Department "to become a deputy and wanted less hours," (2) indicated that he had

completed his training at the Dayton Police Academy but was not hired—despite the academy generally only allowing recruits that it plans to hire for the Dayton Police Department to enroll; and (3) falsely answered "NO" to the question "Have you ever been asked (or given the opportunity to resign) from any employment position," despite what had occurred with the Grandview Medical Center Police Department.  Wysong did not ask Sanderson about these items.  Using the release that Sanderson had signed as part of his employment application, Wysong could have sought records from the Montgomery County Juvenile Court, the City of Dayton, and Grandview Medical Center regarding Sanderson's earlier employment.  However, Wysong did not seek that information from Sanderson's past employers.  Wysong testified that, had he received records from Montgomery County and known that Sanderson had been suspended for looking at sexually explicit images and pornographic materials, then Sanderson probably would not have been hired.  Wysong also testified that, had he received records from Grandview Medical Center and known that multiple nurses had separately stated that Sanderson had shown them pictures of his penis, then Sanderson would not have been hired.

At a Village council meeting, Wysong recommended that Sanderson be hired.  No one made any inquiries concerning Sanderson or whether to hire him.  The Village hired Sanderson, and he was sworn in at a Village council meeting as an auxiliary patrol officer.

Sanderson was appointed as an auxiliary police officer for the Village on or around November 10, 2015.  Such officers are expected to commit to one, eight-hour shift per week, although hours may fluctuate.  Sanderson testified that his normal hours would be from 6:00 P.M. or 7:00 P.M. to 2:00 A.M., that he would be the only police officer on duty during that time, and that the Village's municipal building—which contains the single-room police department—would be locked during that time.  (Sanderson had a key to the Village's municipal building while on

6

duty as a Village police officer.)  Again, Sanderson's alleged actions against Ms. Brickles and Ms. Walker took place in May and June of 2017, approximately one-and-a-half years after he was appointed.  Wysong testified that Plaintiffs' allegations were the first and only complaints reported against Sanderson throughout Sanderson's tenure with the Village or G4S.

## II.    LEGAL STANDARDS FOR SUMMARY JUDGMENT

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c). Alternatively, summary judgment is denied "[i]f there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S Ct. 2505, 91 L. Ed. 2d 202 (1986)).

The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  The burden then shifts to the nonmoving party, who "must set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)).  In opposing summary judgment, the nonmoving party cannot rest on its pleadings or merely reassert its previous allegations.  It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).  Rule 56 "requires

the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S. at 324.

A party's failure "to properly address another party's assertion of fact as required by Rule 56(c)" can result in the Court "consider[ing] the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e). Additionally, "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989).

In ruling on a motion for summary judgment, it is not the judge's function to make credibility determinations, "weigh the evidence[,] and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 255. In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in that party's favor. *Id.* at 255; *Matsushita*, 475 U.S. at 587; *Tolan v. Cotton*, 572 U.S. 650, 660, 134 S. Ct. 1861, 188 L. Ed. 2d 895 (2014). However, the "mere existence of a scintilla of evidence in support of the" nonmoving party is not sufficient to avoid summary judgment. *Anderson*, 477 U.S. at 252. "There must be evidence on which the jury could reasonably find for the plaintiff." *Id*. The inquiry, then, is "whether reasonable jurors could find by a preponderance of the evidence that the" nonmoving party is entitled to a verdict. *Id*.

## III.    <u>ANALYSIS</u>

As mentioned above, the Village and Wysong seek summary judgment on all remaining claims against them. Those claims are (1) inadequate screening under Section 1983; (2) discriminatory practices in public accommodation under Ohio state law; and (3) loss of consortium under Ohio state law.

A.  **Inadequate Screening Claims (Claims 6 and 21)**

The Sixth (regarding Tina Brickles) and Twenty-First (regarding Kelsey Walker) Claims

for Relief are municipal liability claims brought pursuant to Section 1983 for inadequate screening.

(Doc. 15 at PAGEID # 108-110, 127-128.)  A Section 1983 claim must satisfy two elements: (1)

"the deprivation of a right secured by the constitution or laws of the United States," and (2) "the

deprivation was caused by a person acting under color of state law."  *Ellison v. Garbarino*, 48 F.3d

192, 194 (6th Cir. 1995).[3]  Here, Sanderson's alleged sexual assaults against Ms. Brickles and Ms.

Walker "violated [their] substantive due process right to bodily integrity."  *Doe v. Magoffin Cnty.*

*Fiscal Ct.*, 174 F. App'x 962, 966-67 (6th Cir. 2006) ("no rational individual could believe that

sexual abuse by a state actor is constitutionally permissible under the Due Process Clause and …

a citizen has a clearly established right under the substantive component of the Due Process Clause

to personal security and to bodily integrity") (internal quotation marks omitted).  Thus, there was

a deprivation of a right secured by the U.S. Constitution.  The issue here is whether the Village or

Wysong (or both) may be held liable for that constitutional violation.[4]

While municipalities are considered "persons" within the meaning of Section 1983, they

cannot be held liable simply because they employ a tortfeasor.  *Magoffin Cnty. Fiscal Ct.*, 174 F.

App'x at 967; *Bd. of the Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 403, 117

S. Ct. 1382, 137 L. Ed. 2d 626 (1997) ("*Bryan Cnty.*") ("[w]e have consistently refused to hold

municipalities liable under a theory of *respondeat superior*").  Instead, a plaintiff seeking to

impose liability on a municipality under Section 1983 must "identify a municipal 'policy' or

---

[3] The statute states, in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress …."  42 U.S.C. § 1983.

[4] No issue is presented regarding the "acting under color of state law" requirement.  *Ellison*, 48 F.3d at 194.

'custom' that caused the plaintiff's injury." *Bryan Cnty.*, 520 U.S. at 403; *see also Monell v. Dept. of Social Servs. of City of New York*, 436 U.S. 658, 691, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978). "Locating a 'policy' ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." *Bryan Cnty.*, 520 U.S. at 403-04. "Similarly, an act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." *Id.*[5]

To establish municipal liability, a plaintiff must (1) "identify conduct properly attributable to the municipality" and (2) "demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." *Bryan Cnty.*, 520 U.S. at 404 (emphasis in original). Thus, "a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Id.* This places "a heavy burden on plaintiffs seeking to impose municipal liability as a result of hiring decisions." *Magoffin Cnty. Fiscal Ct.*, 174 F. App'x at 967.

Furthermore, the Supreme Court has explained that, where a plaintiff seeks "to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights[, then the plaintiff] must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences." *Bryan Cnty.*, 520 U.S. at 407. "A showing of simple or even heightened negligence will not suffice." *Id.* Instead, deliberate

---

[5] As noted below, the Supreme Court in *Bryan Cnty.* recognized that there is a question "whether, under *Monell* and subsequent cases, a single hiring decision by a [decisionmaker with final authority] can be a 'policy' that triggers municipal liability." *Bryan Cnty.*, 520 U.S. at 404. The Supreme Court did not decide the issue. Instead, it found the evidence in that particular case was insufficient to support a finding of municipal liability, "[e]ven assuming without deciding that proof of a single instance of inadequate screening could ever trigger municipal liability." *Id.* at 412.

indifference "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Id.* at 410.

### (1) <u>Final Authority</u>

The Village and Wysong first argue that Wysong was an employee without final policymaking authority and, therefore, the inadequate screening claim fails because the claim is premised exclusively on the conduct of Wysong. They assert that the final policymakers were the Village mayor and Village council. Plaintiffs make two arguments in response. First, Plaintiffs say that there is a genuine issue of material fact regarding whether Wysong was the final policymaker for Sanderson's hiring. For this argument, Plaintiffs rely on a supposed lack of evidence regarding the Village's form of government and regarding who actually appointed Sanderson. The Court disagrees with Plaintiffs.

"Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481, 106 S. Ct. 1292, 89 L. Ed. 2d 452 (1986); *see also Miller v. Calhoun Cnty.*, 408 F.3d 803, 813 (6th Cir. 2005). Such final authority "may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority." *Pembaur*, 475 U.S. at 483. "Mere authority to exercise discretion while performing particular functions does not make a municipal employee a final policymaker unless the official's decisions are final and unreviewable and are not constrained by the official policies of superior officials." *Feliciano v. City of Cleveland*, 988 F.2d 649, 655 (6th Cir. 1993). Whether an official had final policymaking authority is a question of state law, which includes state and local law, "such as statutes, ordinances, and regulations, and less formal sources of law such as local practice and custom." *Id.* The identification of officials whose decisions represent official policy of a local government unit

is a question of law for the Court to resolve. *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737, 109 S. Ct. 2702, 105 L. Ed. 2d 598 (1989).

The Court finds that there is no genuine issue of material fact regarding whether Wysong was a final policymaker for Sanderson's hiring. One, there is no evidence that Wysong was granted final authority by a legislative enactment. Instead, state and local law show that he does not hold such final authority. O.R.C. § 737.16 ("The mayor shall, when provided for by the legislative authority of a village, and subject to its confirmation, appoint all deputy marshals, police officers, night guards, and special police officers"); PHILLIPSBURG, OH., CODE OF ORDINANCES § 34.03(A) ("The Mayor shall, when provided for by the Legislative Authority, and subject to its confirmation, appoint all deputy marshals, police officers, night guards, and special police officers"). Two, there also is no evidence that the Village mayor or Village council delegated such final authority to Wysong. The evidence is the opposite: Wysong made a recommendation to the mayor, and the mayor made the actual decision. (*See, e.g.,* Doc. 60-1 at PAGEID # 599-600, 610-611 (Wysong testifying that he would introduce at a Village council meeting an applicant that he recommended be hired, and he would then make a recommendation to the mayor to hire the individual; also testifying that particular portion of the standard hiring process took place with respect to the decision to hire Sanderson); Doc. 64-6 at PAGEID # 942-43 (Notice of Peace Officer Appointment signed by the Mayor of Phillipsburg as the "Appointing Authority" for Sanderson's appointment as an auxiliary patrol officer for the Village).) Therefore, Wysong was not the official who had final policymaking authority when it came to the Village's decisions to hire police officers, including Sanderson. *Miller*, 408 F.3d at 813-814 (affirming summary judgment for defendant sergeant; plaintiff did not offer sufficient evidence that defendant sergeant had final policymaking authority); *Feliciano*, 988 F.2d at 655-66 (affirming summary judgment that found

12

police chief was not the final policymaking official, based on the city charter, city code, and lack of evidence showing otherwise); *Hull v. Cuyahoga Valley Joint Vocational Sch. Dist. Bd. of Educ.*, 926 F.2d 505, 515-16 (6th Cir. 1991) (affirming summary judgment for municipality, finding that Ohio state statute indicated who had final policymaking authority with respect to the action ordered (termination of plaintiff's employment), and explaining that "final policymaker" is narrowly-defined); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 126, 108 S. Ct. 915, 99 L. Ed. 2d 107 (1988) ("*Praprotnik*") ("a federal court would not be justified in assuming that municipal policymaking authority lies somewhere other than where the applicable law purports to put it").

Next, the Plaintiffs' other response to the "Wysong was without final policymaking authority" argument is that, even if that's true, the Village is a named defendant, a final policymaker acting in an official capacity on behalf of the Village failed to properly screen Sanderson and hired him, and therefore the Village may be held liable for Sanderson's alleged constitutional violations while acting as a Village police officer. The Village and Wysong counter by saying that the Court should ignore Plaintiffs' argument because it is an improper expansion of Plaintiffs' claim by asserting a new theory of liability for the first time in opposition to their summary judgment motion. The Court disagrees with the Village and Wysong.

The Village and Wysong correctly point out that a party cannot advance a new claim or new cause of action, or expand its claims to assert new theories, in response to a motion for summary judgment. *Bridgeport Music, Inc. v. WB Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007) ("[t]o the extent [plaintiff] seeks to expand its claims to assert new theories, it may not do so in response to summary judgment") (citing *Tucker v. Union of Needletrades, Indus., & Textile Employees*, 407 F.3d 784, 788 (6th Cir. 2005) (holding that a plaintiff may not raise a new legal claim in response to summary judgment)). However, the Court finds that Plaintiffs have not done

so. In the Amended Complaint, Plaintiffs allege that the Village hired Sanderson as a police officer, bring claims for "Municipal Liability for Inadequate Screening" pursuant to 42 U.S.C. § 1983, and make allegations to support the two elements of a Section 1983 claim set forth above. (*See* Doc. 15 at PAGEID # 91, 108-110, 127-28.) Regardless of the identity of the Village's final authority for hiring decisions, Plaintiffs' theory for these claims remains that the Village is liable for Sanderson's sexual assaults that were (allegedly) caused by the Village hiring Sanderson without adequate screening. And, the Village and Wysong cannot—and do not even attempt to— argue "unfair surprise." *Tucker*, 407 F.3d at 788 (explaining that the reason for preventing a party from advancing a new claim for the first time in a response to a motion for summary judgment is to avoid subjecting the opposing party "to unfair surprise").

Therefore, the Court proceeds to the other arguments made by the Village and Wysong for summary judgment on the inadequate screening claims. *Bard v. Brown Cnty., Ohio*, 970 F.3d 738, 749-50 (6th Cir. 2020) (plaintiff did not expand her Section 1983 claim or raise a new claim in response to a motion for summary judgment; a newly developed theory of events did not subject defendants to unfair surprise); *Spengler v. Worthington Cylinders*, 514 F. Supp. 2d 1011, 1017-18 (S.D. Ohio 2007) (disagreeing with defendant's argument that plaintiff's claim was asserted for the first time in opposition to a summary judgment motion); *Clark v. Shop24 Global, LLC*, 77 F. Supp. 3d 660, 691 (S.D. Ohio 2015) (same; finding that, despite the lack of an explicit reference to a theory of successor liability in the amended complaint, the record suggested that the defendants had notice of the theory and were not subject to unfair surprise by the plaintiff's reliance on that theory in response to a motion for summary judgment).

### (2) Municipal Liability for Single Incidence of Inadequate Screening

Next, the Village and Wysong argue that, regardless of the identity of the Village's final

14

authority for hiring decisions, the claim fails because a single instance of inadequate screening can never result in municipal liability (i.e., one hiring decision can never qualify as a policy or custom). The parties have pointed to opposing district court outcomes on the issue. *See Wilborn v. Payne*, No. 09-2545, 2011 U.S. Dist. LEXIS 84017, 2011 WL 5517184, at *5 (W.D. Tenn. July 29, 2011) (granting defendants' motion for summary judgment on municipal liability claim for inadequate screening because "[p]laintiff has cited no authority for the proposition that a single heinous incident following a failure to screen an applicant can prove a municipality's deliberate indifference"); *Jones v. James*, Civ. No. 02-4131, 2005 U.S. Dist. LEXIS 3096, 2005 WL 459652, at *4 (D. Minn. Feb. 24, 2005) (denying municipality's motion for summary judgment on inadequate hiring claim involving what appears to be a single instance of inadequate screening where genuine issues of material fact remained). As the courts in *Bryan Cnty.* and *Magoffin Cnty. Fiscal Court* did, this Court will assume—without deciding—that proof of a single instance of inadequate screening can possibly trigger municipal liability in a narrow range of circumstances. *Bryan Cnty.*, 520 U.S. at 409, 412 (despite the assumption, the evidence was insufficient to support a finding of municipal liability); *Magoffin Cnty. Fiscal Court*, 174 F. App'x at 968 n. 5 (same). The Court need not determine whether a single instance of inadequate screening can ever result in municipal liability. As shown below, regardless of the answer, the Village and Wysong are entitled to summary judgment on Plaintiffs' Section 1983 claims of inadequate screening.

### (3) Assessment of Liability for the Village and Wysong in His Official Capacity

The Village and Wysong argue that, even if a single instance of alleged inadequate screening can result in municipal liability, the inadequate screening claim here fails because Plaintiffs cannot meet the heavy burden for establishing such a claim. In response, Plaintiffs argue that the single instance of inadequate screening here imposes municipal liability on the Village and Wysong because a review of Sanderson's background would have revealed that Sanderson

would cause constitutional harm to women he would encounter and arrest as a police officer for the Village. In Plaintiffs' view, the Village is liable for a single instance of inadequate screening here because the Village's mayor and council, in their official capacities as the final policymakers for the Village, acted with deliberate indifference to known or plainly obvious consequences that hiring Sanderson would cause when Sanderson was hired without proper screening (so, therefore, the Village may be held liable for Sanderson's subsequent constitutional violations while acting as a Village police officer).[6]

Plaintiffs' evidence regarding the actions (or inactions) of the Village's mayor and council include the Village's mayor and council not personally reviewing Sanderson's background and not asking questions regarding Sanderson at the Village Council meeting, but instead following Wysong's recommendation that Sanderson be hired and hiring Sanderson. The Village and Wysong counter that Plaintiffs have produced no evidence that the Village's mayor or council: acted with deliberate indifference by hiring Sanderson, or expressly approved Wysong's decision to forgo the employment questionnaires and personal reference checks, or knew that Wysong was

---

[6] Although Plaintiffs point to a statement in the Magistrate Judge's Amended Report and Recommendation (the "R&R"), the R&R concerned a Rule 12(b)(6) motion—which has a different legal standard than a Rule 56 motion for summary judgment—and the statement was based on allegations in the Amended Complaint, including that Wysong was "the final decisionmaker with respect to hiring decisions at the" Village. (*See* Doc. 64 at PAGEID # 716, citing Doc. 31 at PAGEID # 312; *see also* Doc. 31 at PAGEID # 313-315.) Regardless, the statement in the R&R does not affect the outcome of the Motion because of the reasoning set forth in this Order. The Court also points out that Plaintiffs assert that, "[i]n his deposition, Sanderson specifically acknowledged the truth of the incident with the prostitute that concerned the Magistrate Judge" (Doc. 64 at PAGEID # 721), but that assertion is not supported by the deposition testimony that Plaintiffs cite in support. (*Compare* Doc. 31 at PAGEID # 317 (R&R stating that Sanderson "sought out a vulnerable woman (a prostitute, he thought) … [and] flaunted his authority to her by showing her a handgun and badge, and he engaged in other misconduct directed at her because she was a vulnerable woman who was alone with him") *with* Doc. 64-1 at PAGEID # 754-56 (Sanderson testifying that a prostitute had flagged him down in his personal vehicle on his way to work as an officer for the Grandview Medical Center Police Department, she hopped into his vehicle, she solicited him for money to perform oral sex on him, and in response he showed her his badge by simply pulling open his coat jacket, told her that he had his weapon on him, that he did not want oral sex, and that she should get off the street, and nothing similar happened on any other occasion).) As Plaintiffs seem to acknowledge, the allegations in the Amended Complaint concerning the alleged known prostitute and that Wysong was the Village's final authority for hiring decisions played a pivotal role in the R&R's analysis of Plaintiffs' inadequate screening claims at the motion to dismiss stage. Again, the statement in the R&R that Plaintiffs quote ends up not affecting the outcome of the Motion.

deviating from the Village's standard screening practice.

In addition to specifying the requirements for municipal liability set forth above, the Supreme Court in *Bryan Cnty.* warned that "[c]ases involving constitutional injuries allegedly traceable to an ill-considered hiring decision pose the greatest risk that a municipality will be held liable for an injury that it did not cause." *Bryan Cnty.*, 520 U.S. at 415. This is because, "[i]n the broadest sense, every injury is traceable to a hiring decision." *Id.* It also warned that "[w]here a claim of municipal liability rests on a single decision, not itself representing a violation of federal law and not directing such a violation, the danger that a municipality will be held liable without fault is high." *Id.* at 408. And, it warned that "[w]here a plaintiff presents a § 1983 claim premised upon the inadequacy of an official's review of a prospective applicant's record … there is a particular danger that a municipality will be held liable for an injury not directly caused by a deliberate action attributable to the municipality itself." *Id.* at 410.

The situation presented here is that the municipality's final authority for hiring decisions (the Village's mayor and council) decided to hire a person (Sanderson) who had been recommended by a municipal employee (Wysong) who—unbeknownst to the final authority (the Village's mayor and council)—deviated from the municipality's standard screening practices. There is no argument that deciding to hire someone is unconstitutional, and no one directed Sanderson to sexually assault the women. *See Bryan Cnty.*, 520 U.S. at 405 ("[w]here a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee"). There also is no evidence presented that anyone other than Wysong knew that Wysong had deviated from the standard screening practices. And, there is no evidence of any prior deviation from the standard

screening practices.

This scenario contrasts with the one presented in *Bryan Cnty.*, where it was the municipality's final authority for hiring who himself deviated from the "ordinary hiring practices." *Bryan Cnty.*, 520 U.S. at 410-11.[7] In the same way, this scenario contrasts with the one presented in the main case relied on by Plaintiffs: *Jones*. In that district court case from Minnesota, the municipality's final authority for hiring decided against contacting any of the previous employers listed on the job application, hired the applicant based on other criteria, and then failed to require the applicant to fill out an application six months later for a different position, which involved transporting inmates (and failed to make any additional investigation into the job applicant's background). *Jones*, 2005 WL 459652, at *2-4. After being hired for the different position (transport officer), the applicant engaged in criminal sexual conduct with an inmate that he was transporting. *Id.* at *1. The district court found that genuine issues of material fact precluded granting the municipality summary judgment on the inadequate hiring claim. *Id.* at *4.

Additionally, Plaintiffs do not cite to any case that allowed a Section 1983 claim for an alleged single instance of inadequate screening where the deviation from the standard screening practices was not committed by the municipality's final authority for hiring decisions. Plaintiffs likewise do not cite to any case that allowed a Section 1983 claim for an alleged single instance of inadequate screening where the deviation from the standard screening practices was not known by the municipality's final authority for hiring decisions.

Furthermore, even assuming Plaintiffs' evidence as true and drawing all reasonable inferences in their favor, a jury could not reasonably find that the Village's mayor or council acted

---

[7] *See also Pembaur*, 475 U.S. at 485 (involving a decision by a county prosecutor, acting as the county's final decisionmaker, where the prosecutor had specifically directed the action that resulted in the deprivation of petitioner's rights).

"with the requisite degree of culpability." *Bryan Cnty.*, 520 U.S. at 404. There is a lack of evidence to reasonably find that their actions were taken "with deliberate indifference" by "disregard[ing] a known or obvious consequence of [their] action[s]." *Id.* at 407, 410. Again, Plaintiffs do not argue that anyone apart from Wysong deviated from the Village's standard screening practices. *Bryan Cnty.*, 520 U.S. at 410. Furthermore, there is no argument—or evidence to support—that there were any prior instances of inadequate screening (or deviation from the Village's standard screening practices) or that that the mayor or council purposely avoided screening Sanderson or any other applicants. *See id.* at 403-04 (discussing the importance of locating a municipal policy or custom that caused the plaintiff's injury); *Atwood v. Town of Ellington*, 427 F. Supp. 2d 136, 148-49 (D. Conn. 2006) (granting summary judgment to municipality on failure to screen claim where "plaintiff has proffered no evidence that [supervisor's] practice of not reviewing personnel files when reappointing [officers] ever led to previous deprivations of the constitutional rights at issue here, and therefore plaintiff cannot show that the Town was deliberately indifferent to the consequences of [supervisor's] hiring practices").

The Court finds no genuine issue of material fact as to whether the Village's mayor or council were deliberately indifferent to the alleged injuries of Ms. Brickles and Ms. Walker in hiring Sanderson. There is not "evidence on which the jury could reasonably find for" Plaintiffs on these claims. *Anderson*, 477 U.S. at 252. At the absolute most, Plaintiffs might be able to show "simple or even heightened negligence" by the Village's mayor or council, but that does "not suffice." *Bryan Cnty.*, 520 U.S. at 407. "Congress did not intend municipalities to be held liable unless *deliberate* action attributable to the municipality directly caused a deprivation of federal rights." *Id.* at 415 (emphasis in original). Coupled with the apparent dearth of authority for imposing municipal liability in such a scenario, the Court finds that the Village and Wysong (in

19

his official capacity) are entitled to summary judgment on the inadequate screening claims. Fed. R. Civ. P. 56.

The Court notes that the Sixth Circuit has recognized it is "conceivable that a custom or policy of failing to perform criminal-background checks might amount to 'deliberate indifference' to the particular constitutional rights of others if, immediately or over time, the consequences of failing to perform the background checks were known or obvious." *Magoffin Cnty. Fiscal Ct.*, 174 F. App'x at 968. However, as in *Magoffin Cnty. Fiscal Ct.*, Plaintiffs do "not point to any other instance in which the [Village's mayor's or council's] failure to perform background checks caused another to be deprived of his or her constitutional rights." *Id.*; *see also Praprotnik*, 485 U.S. at 127 ("egregious attempts by local governments to insulate themselves from liability for unconstitutional policies are precluded by … recogni[tion] that a plaintiff may be able to prove the existence of a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law") (internal quotation marks omitted). Plus, the Village's standard hiring practice included conducting a criminal background check, and the undisputed evidence shows that Wysong conducted one for Sanderson. Additionally, and without analyzing or commenting on whether such arguments would change the outcome of the Motion, the Court mentions that (1) these claims are not claims that the Village's mayor or council failed to train or supervise Wysong; and (2) Plaintiffs do not argue that the Village's mayor or council ratified Wysong's actions in skipping steps for his screening of Sanderson. *See Feliciano*, 988 F.2d at 656 (finding that plaintiff failed to offer proof that the final policymaker expressly approved the subordinate's actions or knew the manner in which the actions were taken; "mere acquiescence in a single discretionary decision by a subordinate is not sufficient to show ratification"); *Praprotnik*, 485 U.S. at 127 (discussing when

20

ratification of a subordinate's decision and its basis may be chargeable to the municipality).

Finally, the Court remarks that the scenario presented here contrasts in several significant ways with the one presented in *Griffin v. City of Opa-Locka*, 261 F.3d 1295 (11th Cir. 2001), a case referenced in the parties' briefing. In *Griffin*, the Eleventh Circuit Court of Appeals affirmed the portion of a jury's verdict against a municipality for the sexual harassment committed by an employee, pursuant to a Section 1983 inadequate screening claim. As background, the Court of Appeals discussed how the evidence established without question that "sexual harassment was the on-going, accepted practice at the City and that the City Commission, Mayor, and other high ranking City officials knew of, ignored, and tolerated the harassment." *Griffin*, 261 F.3d at 1308. Regarding the hiring in question, the Court of Appeals explained:

> Neal was hired as City Manager according to some testimony without a resume, interview, background check, or any discussion of his qualifications. … [A]t the time when the City was considering hiring Neal, it was inundated with articles, faxes, and mail, warning of Neal's problems with sexual harassment and dealings with women. There was testimony that some of the faxes included a list of prior sexual harassment charges against Neal. Other faxes included explicit warnings that the City was going to have a sexual harassment and/or sexual assault problem if it hired Neal. Both a citizen who attempted to raise these complaints at a City Commission meeting and a City Commissioner who, concerned about the sexual harassment red flags, requested more information on Neal's background, were disregarded. Moreover, there was testimony that Neal was a known womanizer, commonly known to the Mayor and Commissioners as Earnie 'Penis' Neal. Most importantly, however, there was testimony suggesting that the City officials were aware that Neal was sexually harassing City employees during the period of time between his appointment as acting City Manager and the time of his final confirmation as permanent City Manager. Despite these red flags indicating that Neal would have problems with sexual harassment, the City hired Neal for a permanent position.

*Id.* at 1313-14. As shown in the background and analysis above, the situation here is quite distinguishable factually, procedurally, and legally.

### (4) Assessment of Liability for Wysong in His Individual Capacity

The Village and Wysong argue that there is no evidence to support holding Wysong liable

on the inadequate screening claims in his individual capacity. More specifically, they argue that there is no evidence that Wysong encouraged, authorized, approved, knowingly acquiesced in, or participated in Sanderson's misconduct. Plaintiffs do not respond to this argument or address Wysong's individual capacity liability in the Opposition.

To the extent that the two remaining Section 1983 claims are brought against Wysong in his individual capacity, he is entitled to summary judgment on them. Persons sued in their individual capacities under Section 1983 can be held liable based only on their own unconstitutional behavior. *Heyerman v. Cnty. of Calhoun*, 680 F.3d 642, 647 (6th Cir. 2012). Moreover, Section 1983 liability will not be imposed on the basis of *respondeat superior*. *Id.* "Supervisory officials are not liable in their individual capacities unless they either encouraged the specific incident of misconduct or in some other way directly participated in it." *Id.* And, "[a]t a minimum, a plaintiff must show that the [supervisory] official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Id.* Perhaps due to the lack of supporting evidence, Plaintiffs have not even attempted to make such a showing here.

## B. Discriminatory Practices in Public Accommodations Claims (Claims 14 and 25)

The Fourteenth (regarding Tina Brickles) and Twenty-Fifth (regarding Kelsey Walker) Claims for Relief are state law claims for discriminatory practices in public accommodations pursuant to O.R.C. § 4112.02(G).[8] (Doc. 15 at PAGEID # 118-119, 133-34.) That statute states:

> It shall be an unlawful discriminatory practice … [f]or any proprietor or any employee, keeper, or manager of a place of public accommodation to deny to any

---

[8] Although federal procedural law applies, federal courts apply state substantive law where the federal court is exercising supplemental or diversity jurisdiction over state law claims. *Shropshire v. Laidlaw Transit, Inc.*, 550 F.3d 570, 573 (6th Cir. 2008); 28 U.S.C. § 1652. Thus, Ohio law governs Plaintiffs' state law claims, and the Court "must apply the State's law as announced by its highest court." *Croce v. New York Times Co.*, 930 F.3d 787, 792 (6th Cir. 2019). "If the Ohio Supreme Court has not provided guidance on the issue at hand, [then the Court may consider the decisions of the State's courts of appeals, relevant dicta from the Ohio Supreme Court, as well as other sources…." *Id.*

person, except for reasons applicable alike to all persons regardless of race, color, religion, sex, military status, national origin, disability, age, or ancestry, the full enjoyment of the accommodations, advantages, facilities, or privileges of the place of public accommodation.

O.R.C. § 4112.02(G).

In support of these claims, Plaintiffs argue that "Ms. Brickles was indeed denied 'access' to a proper detention and arrest when Sanderson, a male employee of the Village, sexually assaulted her after detaining and bringing her into the municipal building on or about June 2, 2017." (Doc. 64 at PAGEID # 724.)  Similarly, Plaintiffs argue that "Ms. Walker was indeed denied 'access' to a proper detention and arrest when Sanderson, a male employee of the Village, raped her while she remained in handcuffs in the municipal building after detaining her on or about May 19, 2017." (*Id.*)  Plaintiffs conclude that, "[u]ltimately, the Village and Wysong discriminated against Plaintiffs by allowing, whether implicitly or explicitly, Sanderson, a male officer, access to the municipal building while it was unstaffed with any form of surveillance so that Sanderson could detain women and sexually assault them in the municipal building, despite Sanderson's history of sexual improprieties." (*Id.*)

The Village and Wysong respond that these discriminatory practice claims must fail on several grounds, including that the municipal building was not a "place of public accommodation" at the time of the assaults, Plaintiffs were not denied the "full enjoyment" of the municipal building, and the allegation "that a failure to staff amounts to a discriminatory practice is nonsensical." (Doc. 60 at PAGEID # 578.)  The Court need only address the argument that Plaintiffs were not denied the "full enjoyment" of the municipal building.

The Court agrees with the Village and Wysong's characterization of these claims as an attempt by Plaintiffs to fit a square peg into a round hole.  This is despite the Court's recognition that O.R.C. § 4112.02(G) "shall be construed liberally for the accomplishment of its purposes."

23

O.R.C. § 4112.08. The statute's "purpose" is "that illegal discrimination in places of public accommodation be totally and finally eradicated, to the end that full enjoyment of such places be available to all persons, regardless of race, color, religion, national origin, or ancestry." *Ohio Civil Rights Comm'n v. Lysyj*, 38 Ohio St. 2d 217, 313 N.E.2d 3, 5 (Ohio 1974), *abrogated on other grounds by statute as recognized in Rice v. Certainteed Corp.*, 1999-Ohio-361, 84 Ohio St. 3d 417, 704 N.E.2d 1217, 1220 n.2 (Ohio 1999); *see also Meyers v. Hot Bagels Factory, Inc.*, 131 Ohio App. 3d 82, 721 N.E.2d 1068, 1082 (Ohio Ct. App. 1999) ("[t]he purpose of [O.R.C. § 4112.02(G)] is to eradicate illegal discrimination in places of public accommodation so that full enjoyment is available to all") (citing *Lysyj*). The Ohio Supreme Court in *Lysyj* explained:

> When determining whether there has been unlawful discrimination under R.C. 4112.02(G), the test is simply whether the proprietor, keeper, manager, or employee of a place of public accommodation has denied to any person the full enjoyment of such place for reasons not applicable alike to all persons, irrespective of race, color, religion, national original or ancestry.

*Lysyj*, 313 N.E.2d at 6. In *Lysyj*, a trailer park operator denied a tenant the full enjoyment of the trailer park by ordering the tenant to leave the premises because the tenant associated with someone of a different race. *Id.* The court found that the operator's "conduct constituted unlawful discrimination within the meaning of R.C. 4112.02(G)." *Id.*

Here, even assuming Plaintiffs' evidence as true and drawing all reasonable inferences in their favor, a jury could not reasonably find that Plaintiffs were denied "the full enjoyment" of the alleged "place of public accommodation" (i.e., the Village's municipal building). Under the statute, "full enjoyment" means "the right to purchase all services or products of a place of public accommodation, the right to be admitted to any place of public accommodation, and the right to have access to the services and products of such a place in the same manner as all other customers." *Meyers*, 721 N.E.2d at 1083. However, Plaintiffs were not purchasing services or products, were not denied admission, and were not denied the right to have access to the services and products of

24

such place in the same manner as all other customers. *See Meyers*, 721 N.E.2d at 1083 (involving alleged gender-based discrimination); *Lysyj*, 313 N.E.2d at 6. Furthermore, the statute does not require the Village to hire staff to surveil the municipal building. Plaintiffs' novel theory for imposing liability on the Village and Wysong under O.R.C. § 4112.02(G) does not correspond with a reasonable interpretation of the statute's language or accomplish the statute's purposes. *Lysyj*, 313 N.E.2d at 5.

Despite the Court liberally construing the statute to accomplish its purposes, and assuming Plaintiffs' evidence as true and drawing all reasonable inferences in their favor, the Court finds that reasonable jurors could not find that Plaintiffs are entitled to a verdict on their state law claims for discriminatory practices in public accommodations (Claims 14 and 25). *Anderson*, 477 U.S. at 252. Therefore, the Court grants summary judgment to the Village and Wysong on those claims.

### C. Loss of Consortium Claim (Claim 15)

The Fifteenth Claim for Relief is a state law claim for loss of consortium brought by Plaintiff Roger Brickles, as the husband of Plaintiff Tina Brickles. (Doc. 15 at PAGEID # 119-20.) Plaintiffs argued in the Opposition that Mr. Brickles' loss of consortium claim must survive because Ms. Brickles' state law claim for discriminatory practices in public accommodations must survive. However, as shown immediately above, that claim—which is Ms. Brickles' only state law claim against the Village and Wysong—does not survive. Therefore, the Court grants the Village and Wysong summary judgment on Mr. Brickles' loss of consortium claim (Claim 15). *Schaefer v. Allstate Ins. Co.*, 1996-Ohio-368, 76 Ohio St. 3d 553, 668 N.E.2d 913, 916–17 (Ohio 1996) ("a loss of consortium claim is derivative in that it is dependent upon the defendant's having committed a legally cognizable tort upon the spouse who suffers bodily injury"); *Gillum v. Fairgreens Country Club*, 110 Ohio App. 3d 60, 673 N.E.2d 637, 642-43 (Ohio Ct. App. 1996) ("while a spouse's claim for loss of consortium is separate and distinct, the uninjured spouse cannot

recover for loss of consortium if there is no cognizable claim under Ohio law that would be available to the injured spouse").

IV.     **CONCLUSION**

For the reasons stated above, the Court finds that the Village and Wysong are entitled to summary judgment with respect to Plaintiffs' Sixth, Fourteenth, Fifteenth, Twenty-First, and Twenty-Fifth Claims for Relief.  The acts allegedly committed by Sanderson against Ms. Brickles and Ms. Walker are despicable.  However, under the relevant prevailing law, Plaintiffs cannot recover against the Village and Wysong on their claims.  Therefore, the Court **GRANTS** Defendants Village of Phillipsburg, Ohio and Mark Wysong's Motion for Summary Judgment (Doc. 60) and dismisses the claims against them with prejudice.[9]  Although no claims remain against the Village or Wysong, this action will continue with Plaintiffs' remaining claims against Sanderson.

**DONE** and **ORDERED** in Dayton, Ohio, this Wednesday, March 10, 2021.

s/Thomas M. Rose

_____

THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE

---

[9] In the last sentence of the Motion, the Village and Wysong "further request that they be awarded their attorneys' fees and costs in having to defend this matter." (Doc. 60 at PAGEID # 580.)  They fail to cite any legal authority in support of the request and fail to submit any information regarding their attorneys' fees or costs in defending this matter.  The Court denies the request.  *See* Fed. R. Civ. P. 54(d); S.D. Ohio Civ. R. 54.1, 54.2 (setting forth procedures for taxation of costs and motions for attorney's fees).